IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
January 11, 2011 Session

**BRYANT GUARTOS v. STATE OF TENNESSEE**

**Direct Appeal from the Criminal Court for Davidson County**
**No. 2001-A-280    Cheryl Blackburn, Judge**

**No. M2010-00801-CCA-R3-PC - Filed July 8, 2011**

A Davidson County jury convicted the Petitioner, Bryant Guartos, of first degree felony murder, especially aggravated robbery, aggravated robbery, and conspiracy to commit aggravated robbery, and the trial court sentenced him to an effective sentence of life plus forty-seven years in the Tennessee Department of Correction. The Petitioner filed an appeal, and this Court affirmed the trial court's judgments. *State v. Bryant Guartos*, M2003-03073-CCA-R3-CD, 2006 WL 163633, at *1 (Tenn. Crim. App., at Nashville, Jan. 24, 2006), *perm. app. denied* (Tenn. Aug. 28, 2006). Thereafter, the United States Supreme Court granted certiorari and remanded the Petitioner's case for further consideration in light of new sentencing case law. *Guartos v. Tennessee*, 549 U.S. 1197 (2007). Upon review, this Court reversed the Petitioner's judgments for especially aggravated robbery, aggravated robbery, and conspiracy to commit aggravated robbery, and remanded the case for resentencing. *State v. Bryant Guartos*, No. M2003-03073-CCA-R3-CD, 2007 WL 4245084 (Tenn. Crim. App., at Nashville, Dec. 4, 2007), *perm. app. denied* (Tenn. July 7, 2008). The Petitioner then filed a petition for post-conviction relief, which the post-conviction court denied after a hearing. On appeal, the Petitioner contends that the trial court erred in failing to find that he received the ineffective assistance of counsel at trial. After a thorough review of the record and applicable law, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the Court, in which DAVID H. WELLES and JERRY L. SMITH, JJ., joined.

J. David Wicker, Nashville, Tennessee, for the Appellant, Bryant Guartos.

1

Robert E. Cooper, Jr., Attorney General and Reporter; Lacy Wilber, Assistant Attorney General; Victor S. Johnson, III, District Attorney General; Bret Gunn, Assistant District Attorney General, for the Appellee, State of Tennessee.

## OPINION
### I. Facts
### A. At Trial

A Davidson County jury convicted the Petitioner of first degree felony murder, especially aggravated robbery, aggravated robbery, and conspiracy to commit aggravated robbery for his participation in the robbery of two security guards who were retrieving Rolex watches from a jewelry store. On direct appeal, this Court summarized the underlying facts of the case as follows:

> At the trial, the murder victim's mother testified that her son was forty-seven years old at the time of his death. She said that before working as a security guard, he had retired from the United States Army, where he had been a Green Beret. She said her son survived twenty-one days after the shooting.
>
> Kimberly Allison testified that on the day of the robbery, she was the store manager of Carlyle and Company, a jewelry store located in Green Hills Mall in Davidson County. She said that on March 16, 1999, her store had a special showing of seventy-five to one hundred Rolex watches. She said that Carlyle and Company had a special showing twice each year and that the special showing lasted only for one day. She said Carlyle and Company advertised the event in the newspaper.
>
> Ms. Allison said that on the day of the special showing, the murder victim and Gene Nagele were the security officers who transported the watches to Carlyle and Company. She said that after the close of business, the watches were secured in the store's vault until the morning when the security officers would return and retake possession of the watches. She said that on the morning of March 17, she arrived as usual, drove into the Green Hills Mall parking garage, parked her car, and saw the victim lying on the ground. She said Gene Nagele was next to the victim, helping him. She said the victim had been shot in the chest. Ms. Allison said that the value of the Rolex watches was between $700,000.00 and $750,000.00 and that the watches were never recovered.

2

Gene Nagele testified that he worked for Corpus Securities International in March 1999. He said the company provided security for Carlyle and Company, escorting Rolex watches to and from shows. He said he was assigned to pick up the watches in Greensboro, North Carolina, take them to the location of the show, and then return the watches to Greensboro. He said the murder victim was his partner for the Carlyle and Company assignment. He said both he and the victim carried .45 caliber handguns.

Mr. Nagele testified that on March 16, 1999, he and the victim arrived at the Carlyle and Company store at Green Hills Mall in their company car, a Jeep Cherokee, with the Rolex watches. He said he had the morning shift and the victim had the evening shift. He said that at the close of business, both he and the victim were present as the watches were secured in the store's vault. He said that on the morning of March 17, he and the victim arrived in the Green Hills Mall parking garage and parked on the second floor. He said they were parked between fifty and one hundred feet from the closest entrance to the Carlyle and Company store, which was on the second floor of the parking garage. He said that when they retrieved the watches, the victim was transporting the watches on a cart and he was behind the victim, providing security. He said that as they approached the Jeep Cherokee, he heard someone running behind him. He said that he turned to see who it was but that as he turned, he was struck in the back, heard a shot fired, fell down, and lost consciousness. He said that before he lost consciousness, he heard his assailants speaking but not in English. He said that although he caught a brief glimpse of his assailants, he could not identify them except to say that "they were not light skinned." He said that when he regained consciousness, he heard the victim calling his name, saying he had been shot. He said he went to the victim's aid and noticed that his own gun and the watches were missing. He said he also noticed a woman trying to get her children out of a car. He said that he had noticed the woman before the robbery as he and the victim were leaving the mall and that she had just arrived with her two small children in car seats. On cross-examination, Mr. Nagele acknowledged that he was unable to identify the [Petitioner] as one of his assailants.

Deborah Sloan testified that on the morning of March 17, 1999, she was in the Green Hills Mall parking garage with her two children. She said she parked about two parking spaces away from the mall entrance. She said she had been parked for about thirty seconds when she saw the security guards leaving the mall. She said she was getting her children ready when she heard a bang behind her car. She said that she turned to see what had happened and

3

that she thought the security guards had dropped one of the big boxes they were transporting. She said she quickly realized that was not what happened as she saw both security guards on the ground and three men running around. She said two of the men were picking up the boxes and the other one was picking up a gun. She said that the men who picked up the boxes ran away but that the other man remained behind to pick up the gun before fleeing. She said she saw all three men get into a fairly new, red or maroon minivan with tinted windows. She said she was not sure if the men knew she was there because she had stayed down. She said the men were in their late twenties, wore baggy clothing, and had dark hair and dark skin. She said it was difficult to tell if they were African-American or Hispanic but said the men were dark skinned. She said the men were not particularly tall or heavy. Ms. Sloan identified the [Petitioner] as the man who picked up the gun.

Ms. Sloan testified that Metropolitan Police Department Detective Norris Tarkington showed her a set of photographs in July 1999. She said she thought she was supposed to identify all of the assailants from the photograph array. She said, however, that she was only able to identify positively one man, the [Petitioner]. She said Detective Tarkington returned in October 2000 and showed her another set of photographs. She said she was able to identify two other people from this set of photographs as the other two men who committed the robbery. She said the second person she identified was Jonathan Londono and the third was Edwin Gomez. She said that of the three men she identified from the photographs, she was most certain about the [Petitioner].

On cross-examination, Ms. Sloan said that she was certain that the [Petitioner] was one of the men involved in the robbery from the moment she saw the photograph array containing his picture. She admitted, however, making a statement to the police that the robbers were black men. On redirect-examination, Ms. Sloan said that in her statement where she described the assailants as black men, she put quotation marks around the words "black men." She said she did so only to indicate that they had dark skin and were not Caucasians. She said she told the detectives why she had put the quotations around the words "black men."

Christina Hudson testified that she worked in the Green Hills Mall in March 1999. She said that on the morning of March 17, 1999, she arrived at the mall and parked in the parking garage. She said she noticed a purple or dark maroon minivan parked behind her. She said a man approached and got

into the van.  She said she was able to see other men in the van.  She said that the men were Hispanic but that she was unable to identify any of them to the police.

The deposition testimony of Dorothy Drake was read into the trial record because she was unable to attend the trial due to surgery.  In her deposition, Ms. Drake said that she was at the Green Hills Mall on March 17, 1999.  She said she parked in the parking garage.  She said that when she entered the mall, she saw some young men standing near the entrance.  She said that although she could not determine the men's ethnicity or race, "they were not American, our race."  She said the men were young.  She said she was unable to identify the [Petitioner] as one of the men she saw at the mall entrance.

Metropolitan Police Department Officer Thales O. Finchum testified that he responded to a robbery call at Green Hills Mall on the morning of March 17, 1999.  He said that when he arrived, he saw the victim lying on the ground, wearing a security guard's uniform.  He said the victim told him that a "mulatto" had shot him and that three men had taken boxes from him containing Rolex watches.  He said he took and secured the victim's weapon, a .45 caliber semi-automatic handgun.  He said that semi-automatic handguns expel shell casings from the weapon when fired but that no shell casings were recovered at the scene.

. . . .

Michelle Nicholson testified that on March 17, 1999, she was traveling on Interstate 40, taking her son to school.  She said she noticed a maroon van with Florida license plates driving erratically on Interstate 40, weaving in and out of traffic.  She said she saw men in the van who were Hispanic.  She said the van took the Hillsboro Road exit, which is the exit for Green Hills Mall.  She said she learned later that a robbery occurred at the Green Hills Mall and that the suspects were Hispanic, traveling in a van.  She said she called the police and told them what she had witnessed earlier in the day.  She said, however, that she did not get a good enough look at the occupants of the van to identify anyone.  On cross-examination, Ms. Nicholson admitted that the van she saw on the interstate had tinted windows in the middle.

Metropolitan Police Department Sergeant Freddie Stromatt testified that he worked in the Metropolitan Police Department's Robbery Division in

March 1999. He said he was assigned to investigate the Green Hills Mall robbery. He said that based upon the information given by Ms. Nicholson, he sent detectives out to check motels along Interstate 40 to determine whether any Hispanic men had stayed at a motel on the night of March 16, 1999. Sergeant Stromatt said they were able to learn that four Hispanic men had stayed at a Howard Johnson located along Interstate 40 at Charlotte Pike, that the Hispanic men had filled out a registration card indicating they were driving a van with Florida license plates, and that the Hispanic men had checked out the morning of the robbery. Sergeant Stromatt said that after they were able to identify suspects, photograph arrays were taken to the motel and that the motel clerks were able to identify the Hispanic men who had stayed in the motel on March 16, 1999.

Sue Madan testified that she was the manager of the Howard Johnson on Charlotte Pike in March 1999. She said she gave to the police telephone records for the date in question and surveillance videotapes from five cameras. She said she talked to one of the Hispanic men who stayed at the motel but could not identify him. On cross-examination, Ms. Madan said that Rafael Cruz was listed on the registration card as occupying room 207 on the night of March 16, 1999.

Tiffany Dozier testified that she worked as a front desk clerk at the Howard Johnson on Charlotte Pike in March 1999. She said the Hispanic men stayed at the motel for three or four days. She said that one of the men acted as a spokesman for the group and that he flirted with her. She said at least five Hispanic men were in the group staying at the motel. She said the men were driving two different vans, one white and one maroon. Ms. Dozier said that in July 1999, Detective Tarkington asked her to look at some photograph arrays. She said she was able to identify the [Petitioner] as the man who spoke English and flirted with her and Jonathan Londono as the man who often accompanied the [Petitioner]. On cross-examination, Ms. Dozier admitted that the person registered as Mr. Cruz occupied rooms 202, 204, 207, 210 and 212 between March 14 and March 17.

Robin Capps testified that she worked as a housekeeper at the Howard Johnson on Charlotte Pike in March 1999. She said that on March 17, 1999, she helped another housekeeper remove a seat that had been left in room 204. She said the seat looked like it was from a van.

Liliana Gonzalez testified that she worked in the pre-paid calling card

6

business in Miami, Florida. She said that in March 1999, she was working for Gloria Telecommunications, which sold pre-paid calling cards in different parts of the United States but mainly in Miami. She said the Metropolitan Police Department asked her to determine if Gloria Telecommunications pre-paid calling cards had been used at certain Nashville area telephone numbers. She said that her research revealed that Gloria Telecommunications pre-paid calling cards had been used from the Nashville area telephone numbers the police had asked her to research. As a result of Ms. Gonzalez' testimony, the state introduced into evidence as an exhibit a listing of telephone records from Gloria Telecommunications.

Metropolitan Police Department Detective James Arendall testified that he was a robbery detective in March 1999. He said that while assisting in the investigation of the robbery at Green Hills Mall, he went to the Howard Johnson on Charlotte Pike. He said that in room 204, he found a pre-paid calling card that had been torn apart and a box of .357 caliber ammunition. He said that the box of ammunition held fifty rounds but that six or seven rounds were missing.

Detective Arendall said he returned to the Howard Johnson a few months later and showed some photograph arrays to Ms. Dozier, who identified the [Petitioner] as the man who spoke English and flirted with her. He said the Metropolitan Police Department's procedure for compiling a photograph array is to enter a suspect's physical characteristics into a computer. He said this produces about 7,000 results. He said the procedure then requires the officer to go through the pictures and find photographs that are similar to the photograph of the suspect. He said the photograph array shown to a witness will contain no information other than the pictures. He said that if a witness made a positive identification, they were presented with an identification form to sign. He said that the identification form had a "comments" section and that whatever the witness said, he would write it down. On cross-examination, Detective Arendall acknowledged that he only investigated room 204 and did not go to rooms 202, 207, 210, or 212.

Metropolitan Police Department Sergeant Johnny Hunter testified that in March 1999, he was assigned to the Technical Investigation Section of the Identification Division. He said he was called to the Howard Johnson on Charlotte Pike to process room 204. He said that he lifted fingerprints from a box of ammunition, a telephone book, and the room telephone. He said, however, that he did not do a comparison analysis on the fingerprints

7

recovered from room 204. On cross-examination, Sergeant Hunter admitted that he was unable to lift fingerprints from any other surface area in room 204.

Tennessee Bureau of Investigation Agent Steve Scott testified that he worked in the bureau's crime laboratory in the Firearms Identification Unit. He said the Metropolitan Police Department sent him the bullet used to kill the victim for analysis. He said that the bullet was manufactured by Remington Peters Corporation and that it was either a .38 or .357 caliber bullet. He said it could have been either caliber because the bullets were interchangeable in a .357 magnum handgun. He said the bullet was fired from a revolver and not from an automatic.

Agent Scott testified that he also received the box of ammunition recovered from room 204. He said that the box held fifty rounds of ammunition but that six rounds were missing. He said that most revolvers hold six bullets. He said that in his opinion, the bullet recovered from the victim was consistent with the bullet cartridges recovered from room 204. On cross-examination, Agent Scott admitted that the bullet recovered from the victim could have been fired from either a .38 caliber or a .357 caliber handgun and that the manufacturer of the weapon could not be determined.

Todd Hagedorn testified that he worked for Integraham St. Louis Seating. He said his company manufactured seats for Daimler-Chrysler minivans. He said he was familiar with the different types of seats his company manufactures for Daimler-Chrysler. He said that he was asked to identify the seat found in room 204. He said the seat came from a 1996 or 1997 model year Chrysler Town and Country minivan.

Lorita Marsh testified that she worked for the Metropolitan Police Department as a fingerprint analyst. She said she compared the sets of fingerprints lifted from room 204 at the Howard Johnson motel with known sets of fingerprints from the [Petitioner], Edwin Gomez, and Jonathan Londono. She said the fingerprint lifted from the telephone book matched the right index fingerprint of the [Petitioner]. She said the fingerprint lifted from the room telephone matched the right middle fingerprint of Edwin Gomez. She said the fingerprint lifted from the box of Remington ammunition matched the right middle fingerprint of Jonathan Londono. On cross-examination, Ms. Marsh acknowledged that she found the [Petitioner]'s fingerprints only on the telephone book.

8

Officer Steven Kaufman testified that he was with the Police Operations Bureau in Florida, which he characterized as a special details unit. He said that on March 1, 1999, he met with the [Petitioner] and his girlfriend at the [Petitioner]'s apartment in Miami, Florida, as part of an official investigation. He said that the [Petitioner]'s telephone number at the apartment was 305-228-8973 and that the girlfriend's work telephone number was 305-640-2460. The telephone records from Gloria Telecommunications reflect that on March 16, 1999, someone called 305-640-2460 using a telephone on the second floor of the Green Hills Mall just down the hall from the Carlyle and Company store.

Jim Spearman testified that he worked for BellSouth Telecommunications. He said that he was the Corporate Security Manager for Middle Tennessee and that he also performed duties as the custodian of records. He said that in his capacity as custodian of records, he occasionally testified in court about BellSouth telephone records. He said he received a subpoena for the telephone records from the Howard Johnson located on Charlotte Pike and for other telephone records from subscribers located in and around Green Hills Mall. He said the records reflected that calls were made from telephones at the Howard Johnson to two different toll free numbers: 800-464-3139 and 800-791-0964. On cross-examination, Mr. Spearman acknowledged that he was unable to determine from which room the calls were placed. As a result of Mr. Spearman's testimony, the state introduced various phone records as exhibits into evidence. The records reflect that someone from the Howard Johnson motel used a Gloria Telecommunication calling card to place a telephone call. They also reflect that someone called the [Petitioner]'s telephone number in Miami from the Howard Johnson motel.

Barbara Franklin testified that she worked for Carlyle and Company in Green Hills Mall. She said she was working the day before the robbery when two Hispanic men came into the store around 3:00 p.m. She said one of the men asked her questions about the Rolex watches. She said that he asked her if the store always had the watches and that she told him the watches were only there for a special showing. Ms. Franklin identified the [Petitioner] as the Hispanic man who asked her questions about the Rolex watches on the day before the robbery. She said the [Petitioner] had long hair that was "pulled back" when he was in the store. On cross-examination, Ms. Franklin admitted that the police never showed her any photographs before the trial. She maintained, however, that she was certain the [Petitioner] was the man who asked her questions the day before the robbery.

9

Stacy Butts testified that she worked for Carlyle and Company in the Green Hills Mall. She said she was working the day before the shooting with Ms. Franklin. She said that on that day, she noticed two men talking to Ms. Franklin about the Rolex watches. Ms. Butts identified the [Petitioner] as one of the two men. She said the [Petitioner]'s hair was shorter on the day before the robbery than it was at the trial. On cross-examination, she said she did not know if the [Petitioner] had a mustache on the day before the robbery.

Metropolitan Police Department Detective Harold Haney testified that he had been assigned to the Armed Robbery Unit in March 1999. He said that his role in the investigation of the robbery was focused initially on watching videotapes from the Howard Johnson motel. He said the videotapes showed a maroon van and a white van in the parking lot on the morning of March 17, 1999. He said the vans left the parking lot at 8:07 a.m.

Detective Haney said that about one year later, he and Detective Tarkington went to Miami, Florida, and talked to the [Petitioner] about the Green Hills Mall robbery. He said he told the [Petitioner] that his fingerprints had appeared in connection with the robbery at Green Hills Mall. He said he then asked the [Petitioner] if he knew anything about the robbery. He said the [Petitioner] told him that the [Petitioner] had heard that four men and a woman went from Miami to Nashville in two rented cars, that one of the men was named Julio, that Julio had died two weeks before the detectives arrived, that another man named Javier was involved, and that the men sold the watches for $200,000.00. Detective Haney said that during this conversation, the [Petitioner] claimed he was not involved in the robbery.

Detective Haney testified that he and Detective Tarkington had further conversations with the [Petitioner]. He said that during these conversations, the [Petitioner] told them he was not in Nashville on the day of the robbery. He said the [Petitioner] said he had heard that the reason the guard was shot was because he was reaching for his gun. He said the [Petitioner] maintained that he had just heard about this crime but that he was not in Nashville.

Detective Haney testified that during another conversation, the [Petitioner] "broke down and started crying." He said the [Petitioner] acknowledged "that we knew who all was there, that we had their names." He said the [Petitioner] told him that he was in Nashville and had stayed at the Howard Johnson motel with "Maria Charry," Jonathan Londono, Edwin Gomez, Javier and someone he knew only as Mosquito. He said the

10

[Petitioner] admitted they had rented two rooms and were driving a maroon van and a white van. Detective Haney said that he told the [Petitioner] his fingerprints were on the seat left behind in room 204 and that the [Petitioner] said his fingerprints should not be on the seat because he had "wiped it off." He said the [Petitioner] admitted planning for the robbery. He said the [Petitioner] told him that the [Petitioner] and his confederates received about $230,000.00 for the watches. Detective Haney said the [Petitioner] admitted that his share was $40,000.00. He said the [Petitioner] admitted that they took a gun but disposed of it. Detective Haney said the [Petitioner] told him that during the robbery, the [Petitioner] and Maria were about one to two blocks away, waiting in the maroon van.

On cross-examination, Detective Haney acknowledged that the interview with the [Petitioner] lasted three to four hours. He said the [Petitioner] did not confess until the last hour. He acknowledged that he did not have a tape recording of the [Petitioner]'s confession and that the [Petitioner] did not sign a confession.

Detective Tarkington testified that he was an investigator in the Robbery Unit. He said he was assigned to work the Green Hills Mall robbery. He said that after a suspect was identified, he went to Ms. Sloan with a photograph array and asked her to identify anyone who looked familiar. He said the "standard procedure for me is to tell the person that the person whom [sic] is the subject of this investigation may or may not be in here. I need for them to look at each of the pictures and tell me if they recognize them and where they recognize them from." He said that Deborah Sloan looked at different photograph arrays and identified the [Petitioner], Jonathan Londono, and Edwin Gomez as the robbers.

Detective Tarkington said he investigated two particular telephones in the Green Hills Mall area. He said the first telephone was located in front of the August Moon Restaurant and the second was located in the mall across from Carlyle and Company. Detective Tarkington also testified concerning the [Petitioner]'s confession. His testimony in that respect was cumulative to that of Detective Haney.

The [Petitioner] testified that he lived in Miami, Florida. He said he made a trip with his girlfriend to Nashville in the middle of March 1999, driving a Nissan Sentra. He said that when he arrived in Nashville, he went to Hickory Hollow Mall where he saw some people he already knew. He said

11

he could not remember their names but thought one was named Javier and another Julio. He said these people told him they did not have any form of identification and asked him for help in renting a room. He said he helped them rent a room at the Howard Johnson motel. He said he rented another room for himself and his girlfriend. He said he stayed in room 202 and the other people stayed in room 204. He said there were seven other people. He said that after he checked in, he went and knocked on room 204 and talked with the people inside. He said he used the telephone book in room 204 to look for a telephone number in the yellow pages to an escort service. He said he called the escort service for the people in room 204. He said he left Nashville a few days later and went to Louisville, Kentucky, and that from Louisville, he returned to Miami.

The [Petitioner] testified that Detectives Haney and Tarkington interviewed him about one year after he returned to Miami. He said he told the detectives about helping rent a room at the Howard Johnson for the people he knew. He said he told them that the other people wanted him to help them buy drugs but that he refused. The [Petitioner] denied confessing to the detectives but did admit checking into the Howard Johnson under an assumed name. The [Petitioner] testified that in March 1999, he had very short hair, that he did not have a ponytail, and that he did not have a mustache because his wife did not like facial hair.

On cross-examination, the [Petitioner] said that the name of the girl he was traveling with was Sandra but that he did not know her last name. The [Petitioner] admitted that when he was in Nashville, he called his wife in Miami at home and at her place of work with a phone card that he borrowed from the people in room 204. He said that his wife did not know he was with another woman and that he and his wife were in a fight at the time. He maintained that the detectives' testimony relating to his confession was false, that he did not go to Green Hills Mall, and that he did not go to Carlyle and Company and ask about Rolex watches. The [Petitioner] said he did not know if he went to any other malls in the Nashville area. The [Petitioner] admitted that he had previous felony convictions for burglary and theft.

*Guartos*, 2006 WL 163633, at * 1-10.

**B. Motion for New Trial Hearing**

Many of the issues the Petitioner raises in his post-conviction petition are related to his

12

complaints on direct appeal. As such, the Petitioner's post-conviction attorney requested the transcript from the motion for new trial hearing be entered into evidence at the post-conviction hearing. We include the following summary of this evidence, in relevant part, as laid out by this Court on the Petitioner's direct appeal:

> Kimberly Allison testified that she was present during jury selection. She said she did not point out the defendant to Ms. Sloan. She said she knew who the [Petitioner] was because he was the person sitting with the attorneys. She said she did look back into the courtroom after she had been excluded but did not recall whether Ms. Sloan did.

> Maria Charry, the [Petitioner]'s mother, testified that she was from Miami and had lived there for fifteen years. She said she understood English but did not speak it. She said she was in the courtroom when the trial started. She identified Ms. Sloan and Ms. Allison. She said that at the trial, she was outside the courtroom and saw Ms. Sloan and Ms. Allison looking through the window to the courtroom. She said that Ms. Allison pointed into the courtroom. Ms. Charry said she then walked over to the door, looked in, and saw her son, the [Petitioner]. On cross-examination, she acknowledged that she heard the trial judge tell the witnesses and jury that Mr. Guartos was standing trial. She acknowledged that she never heard what Ms. Allison and Ms. Sloan said while looking through the window.

> .   .   .   .

> Deborah Sloan testified that she did not look through the window with Ms. Allison during trial. She said she saw the defendant in the courtroom during voir dire. She testified to the following:

>> Q. Before you testified, did anyone ask you if he looked familiar to you?

>> A. Well, that morning, I had been introduced to, I suppose, [the Petitioner] when I got introduced to the Judge and all these people to make sure nobody was recognized or knew each other, I suppose, and then when I was on, after I left there, they wanted to know if I recognized him before, then I went back in to testify.

>> Q. And who asked you if you recognized anyone?

A. I don't really recall. I think it was either [the assistant district attorney] or the victim's advocate lady-I'm not sure what her title is, but she had kind of shown us where to go that day and told us what to do and all that stuff.

Q. So it was somebody from either the Police Department or the District Attorney's office?

A. Yes, yes.

Q. And when you were asked either by [the assistant district attorney] or the lady from the DA's office if anyone looked familiar, what did you say?

A. Yes.

Q. Okay, and what did you tell them?

A. That, yes, that was the man at the Green Hills Mall that day.

. . . .

Ms. Sloan said she identified the [Petitioner] in a photograph array sometime after the robbery. She identified a form that she admitted signing.

Q. Okay. Is there a place on the form where you said you identified him?

A. There is a place for me to sign where it says signature of person making the identification, and that is all I was asked to do is to sign my name on that line.

Q. Before or after it was filled out?

A. After it was filled out with the words, the detective wrote those words, and he asked me if those are the words that I said, and I said, yes, it is, and he said can you please sign here where it says signature of person making identification, and that is where I signed it.

THE COURT: What were those words?

A. Number two looks familiar. Number three's face looks familiar but hair would be shorter. She continued to look at photo number two.

She testified that her voice was the voice on the 9-1-1 tape but that the tape did not include her giving directions to the 9-1-1 operator to her location. After defense counsel showed her a mug shot taken of the [Petitioner] two weeks before the crime, Ms. Sloan said the photograph looked familiar but she did not know for sure who it was. She said she was not sure that the photograph was a picture of the shooter but she believed that she saw the man in the photograph the day of the shooting. She said that she did not remember the length of the [Petitioner]'s hair or whether he was wearing a hood over his head. In the defense's offer of proof, Ms. Sloan acknowledged that the forms for her identifications of the two co-defendants were marked as positive identifications, but the form on the defendant contained only comments and was not marked as a positive identification. Ms. Sloan admitted that her car had tinted windows.

Detective Tarkington testified that no physical lineups were conducted in this case. He said that he took notes on a notepad while the [Petitioner] was interviewed. He said that once he reduced his handwritten notes to typewritten form, he discarded the handwritten notes. He said he did not read the [Petitioner] his Miranda rights when he interviewed the defendant in Miami. He acknowledged that he testified at the trial that the interview with the [Petitioner] lasted about four hours. He also acknowledged, after being shown the movement sheets from the jail in Miami, that the interview may have lasted only two hours. He said three other officers participated in the [Petitioner]'s interview. He said that he interviewed a woman while in Miami but that he was unable to ascertain her true identity. He acknowledged he sent a letter to Ms. Franklin when he could not get in contact with her through telephone calls. He admitted the statements the [Petitioner] made to him after the [Petitioner] arrived in Nashville may not have been included in the file given to the district attorney's office.

The [Petitioner]'s trial attorney testified that he was not aware of the [Petitioner]'s statement made to Detective Tarkington in Nashville or the 1999 mug shot. He said he became the attorney of record only six weeks before the trial. He said he did not obtain the Florida jail movement sheets because he did not know the length of the interview would be an issue until he got to trial. He said he did not know that Detective Tarkington destroyed his notes until after trial and that the state never told him about the destroyed notes. He said

15

that he filed a discovery motion but that the state told him to get the discovery material from the file or from the public defender's office. He said that he obtained audio tapes of interviews of Ms. Franklin and Ms. Butts and a videotape of Mr. Nagele's interview but that he never played them for the [Petitioner]. He said he was aware that identification was an issue in this case but was unaware that anyone could identify the [Petitioner] as being at the scene. He testified that if he had had the mug shot, he would have used it to cross-examine Ms. Sloan. He said that he did not have a copy of the police report stating someone called an escort service from the Howard Johnson motel. He said he did not have the newspaper article written near the time of the shooting. He acknowledged he did not file a motion to suppress the statement or a motion about the identification issues. He acknowledged the state provided Jencks material and the tapes before the trial.

The [Petitioner] testified that he was arrested in Miami on March 1, 1999, and that the police department took his mug shot. He said he knew about the mug shot but did not tell his attorney about it. He said his attorney told him that no one at the mall at the time of the shooting could identify him. He identified a photograph taken of him in Nashville in 2000. He said that his hair was long on top in the picture but even longer at the trial. He said in March 1999, his hair was short. He said that when the Nashville police officers interviewed him both in Miami and in Nashville, he asked for his lawyer and was not read his Miranda rights. He testified he did not make the statements to Detective Tarkington in Miami that were introduced at the trial. He said that in his Nashville interview, he told Detective Tarkington that he could not talk to him without his lawyer and that the detective returned him to his cell. He identified the picture of himself used in the photograph array as having been taken in 1995 or 1996. He said that he testified at the trial that his fingerprint was on the telephone book because he called an escort service. He said that there was no other evidence to support his statement about the fingerprints at the trial but that Detective Haney's report would have corroborated his trial testimony. He acknowledged the arresting officer from his March 1999 case in Miami testified at the trial. The [Petitioner] acknowledged that on cross-examination, he did not ask the officer from Miami about the length of his hair in March 1999.

Detective Haney testified that the interview of the [Petitioner] in Miami could have lasted only two hours though he testified at the trial that it was three and a half to four hours. He said that he was writing notes but that he only wrote one to two pages. He said he brought the notes back to Nashville,

16

compared them to Detective Tarkington's notes, and destroyed them after the trial. He said there was nothing in his notes that could have added to or taken away from the supplement typed up by Detective Tarkington. He said he did not tell the prosecution about the destroyed notes. On cross-examination, Detective Haney acknowledged he did not have a watch or clock in the interview room. He acknowledged that during the trial, neither the state nor the [Petitioner] asked him about his notes.

Assistant District Attorney General Bret Gunn testified that he was primarily responsible for discovery. He said he disclosed all of the descriptions of the potential suspects in the various discovery responses. He said he had never seen the mug shot taken of the [Petitioner] in Miami. He said that Ms. Sloan's telephone call was prematurely disconnected in the 9-1-1 tape and that he never had any other 9-1-1 tape of her telephone call. He said he did not know anything about the detectives' handwritten notes. He said he was not aware that Detective Tarkington talked to the [Petitioner] once he was extradited to Nashville. He said that if he had known about the statement made by the [Petitioner] in Nashville, he would have used it at the trial. He said he never questioned Ms. Sloan about her windows being tinted because it was not in any of the reports. He said there was no indication that Ms. Sloan could not see out of her car windows. He said that he disclosed all the tapes he was provided and that he did not know until the second trial that a microcassette of an interview with Mr. Nagele existed. He said that if he had known about the microcassette tape, he would have disclosed it but that the tape contained nothing exculpatory.

On cross-examination, General Gunn said that undeveloped photographs in the case existed, were made available to be copied from the property room, and included photographs of Ms. Sloan's car. He acknowledged someone from his office probably asked Ms. Sloan if she recognized anyone from the day of the incident. He acknowledged Ms. Sloan and other witnesses were in the courtroom when [the Petitioner] was identified as the defendant. He said that he reviewed the microcassette tape of Mr. Nagele's interview and that the tape did not contain additional information to what Mr. Nagele said in his videotaped or written statements. He acknowledged the transcript of the microcassette stated that the [Petitioner] was wearing a hood over his head but said he could not remember if Mr. Nagele testified to that at the trial.

The [Petitioner] introduced into evidence certain exhibits of relevance

17

to this appeal: a police report prepared by Detective Tarkington containing the statements of a confidential informant and filed under seal, a police report prepared by Detective Haney concerning the escort service, a mug shot taken of the [Petitioner] on March 1, 1999, in Miami, the photograph array shown to the witnesses in Nashville, and a newspaper article. The police report prepared by Detective Tarkington filed under seal contains evidence gathered from a confidential informant, the report prepared by Detective Haney states that someone from room 204 called an escort service, the mug shot of the [Petitioner] shows that he had very short hair, but the photograph from the photograph array shows the [Petitioner] with longer hair on top and in the back but shorter on the sides. The newspaper article, published in the Tennesseean on March 18, 1999, stated that Ms. Sloan "crouched down in her seat, told her boys to be quiet and hoped the men would not see her."

*Guartos*, 2006 WL 163633, at * 11-15.

## C. The Post-Conviction Hearing

The Petitioner filed a post-conviction petition in which he alleged Counsel was ineffective because Counsel failed to: (1) adequately investigate the case; (2) challenge the pre-trial identifications of the Petitioner; (3) file a motion to suppress the Petitioner's statements to Nashville detectives; and (4) object to the "misleading characterization" of telephone records entered at trial. At the post-conviction hearing, the following evidence was presented: the Petitioner testified that he had completed the ninth grade and that he was twenty six or twenty seven when arrested on these charges. The Petitioner said that he was originally appointed a public defender but that, after the trial date was already set, he hired Counsel to handle his case. The Petitioner recalled that Counsel told him that the State did not have any witnesses who could identify him. At trial, however, several of the State's witnesses identified the Petitioner. Some of these witnesses testified that the Petitioner had long hair at the time of the crime, and the Petitioner testified that this could have been contradicted by a mug shot taken of him by Miami police after his arrest ten to fifteen days before the crime in this case occurred. The Miami mug shot depicted his hair in a "military cut" and "real short all over." The mug shot also portrayed his skin as being light, contradicting the testimony of the State's witnesses that described him as "dark-skinned." The Petitioner said that Counsel was ineffective because he failed to obtain this Miami mug shot and use it at trial to challenge the State's witnesses' identification of the Petitioner.

The Petitioner also complained that Counsel did not obtain or use a newspaper article written about the robbery to challenge Sloan's identification of the Petitioner. The article indicated that Sloan's car, from which she viewed the robbery, had tinted windows. The

Petitioner testified that he only learned of the article because lawyers at his co-defendants' trial offered it in his co-defendant's defense.

The Petitioner testified that Counsel failed to provide him with or use at trial a recorded statement about the robbery made by the surviving security guard. The Petitioner said that he believed that Counsel could have used the statement to challenge the security guard's testimony at trial about the specific location of the robbery within the parking garage.

The Petitioner said that Counsel did not adequately investigate the case because Counsel did not speak with Sloan or review the security guard's statement. The Petitioner further stated that "they" said the robbers were wearing hoods and masks and that Counsel failed to "investigate" this claim.

Finally, the Petitioner said that Counsel rendered ineffective assistance because he failed to obtain "movement sheets" from the jail in Miami where the Petitioner was incarcerated when Nashville detectives interviewed him about this case. According to the Petitioner, the movement sheets, which document how long an inmate is with a visitor, indicated that the interview with Nashville detectives lasted for an hour and twenty minutes. Detective Tarkington testified at trial that the Petitioner was interviewed for a longer period of time. The Petitioner testified that this discrepancy proved the detectives were lying and that Counsel should have obtained these records for use at trial.

The Petitioner testified that Counsel discussed with him the Miami interview with the Nashville detectives and that the Petitioner told Counsel that he never made any statements about the robbery to the detectives. The Petitioner complained that Counsel never challenged the introduction of the statements from this Miami interview, even though the Petitioner told Counsel that the only thing he said to the detectives in Miami was that he wanted an attorney.

On cross-examination, the Petitioner agreed that he received discovery in this case, which included the photographic line-ups shown to the witnesses and their identifications of the Petitioner from the line-ups. The Petitioner said that the picture used in these photographic line-ups was an older picture of the Petitioner taken when his hair was longer. The Petitioner acknowledged, however, that he never told Counsel that more recent mug shots existed that were taken ten to fifteen days before this incident that depicted the Petitioner with a different hair length. The Petitioner explained that he did not mention it because Counsel had told him that none of the witnesses could identify the Petitioner.

The Petitioner agreed that, because nothing in the discovery response indicated how long the Nashville detectives interviewed the Petitioner in Miami, Counsel had no way of knowing what the detectives' testimony at trial concerning the length of the Miami interview

would be.

The Petitioner agreed that he testified at trial that the police were lying about any admissions made by the Petitioner during the Miami interview. The Petitioner acknowledged that he did not tell the jury that the Miami interview was shorter than the detectives testified to at trial, but he explained that he did not do so because, at the time of trial, he did not remember how long the interview had lasted.

The Petitioner agreed that he never requested a continuance of his trial and that he did not request that the trial court remove Counsel from the case. He said that, at the time he hired Counsel, the trial court made it clear that the trial date was scheduled and would not be moved. He further agreed that he and his family made the decision to retain Counsel, despite the limited time Counsel had to prepare for the trial.

Counsel testified that he had practiced law for twelve years and during that time had tried at least thirty cases. Counsel testified that he had represented clients on homicide charges in "several dozen" cases and had tried two homicide cases prior to representing the Petitioner. Counsel said that the Petitioner contacted and retained him approximately two months prior to the trial date in this case. The first time that Counsel appeared in court on the Petitioner's behalf, the trial court made it "very clear" that the trial date for this case would not be changed because one of the co-defendants to these crimes had raised a speedy trial claim and the co-defendant's case would not be heard until after the Petitioner's case. This allowed Counsel approximately six weeks to prepare for the Petitioner's trial. Counsel said that, when the trial court asked if he could be prepared for the Petitioner's trial by the trial date, he had no doubt that he could do so.

In preparation for trial, Counsel testified that he reviewed the discovery materials and went over them with the Petitioner. Counsel identified some of the issues he expected to be important at trial. Counsel interviewed some of the witnesses, but was unable to make contact with "a couple" of the other witnesses. Counsel said that the Petitioner's family, who was paying for Counsel's fees and the case expenses, could not afford to hire a private investigator, so Counsel had to do all the investigatory work on his own during a very short period of time. Counsel agreed that neither he nor the previous attorney who represented the Petitioner filed any motions to suppress. Counsel agreed that, at the time of trial, he believed the identifications might not be "very clear or very positive identifications." Counsel did not recall specifically whom he interviewed, but recalled interviewing one or two of the witnesses from the parking garage and one of the jewelry store employees.

Even though Counsel did not think the witness identifications would be "positive," one of the witnesses, Sloan, identified the Petitioner at trial. Counsel testified that he challenged

this identification through a line of questioning that included the angle and position from which the witness saw the events, the lighting at the scene, and any possible distractions at the scene. Counsel said that, through his questioning, he raised issues of whether the witness had the ability and the time to see someone and then at a later date identify the suspect.

Counsel testified that he never obtained the Miami mug shot taken shortly before this incident. Counsel agreed that the Petitioner told him that he had been arrested in Miami before this incident for a domestic disturbance. The Petitioner, however, never mentioned that the mug shot depicted the Petitioner with a different hair length. Counsel testified that he did not attempt to get the Miami inmate movement records because he did not have time to do so. Counsel recalled that he contacted the Petitioner's attorney in Miami, but he did not recall the result of this contact. While unsure of the exact date, Counsel said that he spoke with Mr. Nagele, the security guard. He could not remember, however, whether he knew that Mr. Nagele made previous statements regarding the robbery, but said he would have attempted to obtain any such statements for use at trial if he had known they existed. After the trial, Counsel was made aware that there was a tape recording of Mr. Nagele's statements about the robbery, which he agreed he could have used to impeach Mr. Nagele in the event he made an inconsistent statement during the trial. Counsel testified that he listened to audio-taped recordings of other witnesses' statements and that, although he was unable to play them for the Petitioner, he relayed the contents of the recordings to the Petitioner.

Counsel testified that he discussed with the Petitioner statements the Petitioner made during the Miami interview and that the Petitioner said he never made any incriminating statements to the detectives. Counsel, who had interviewed the detectives before trial, attempted to elicit testimony from them during trial to support the Petitioner's contention that he did not make any incriminating statements. Counsel agreed that he did not file a motion to suppress the detectives' testimony about the Petitioner's statements, but rather tried to impeach their testimony. Counsel said that he did not learn until after the trial that the detectives had handwritten notes from the interview.

On cross-examination, Counsel agreed that, while some witnesses to the robbery could not conclusively identify the Petitioner, there existed other incriminating evidence against the Petitioner: the Petitioner's fingerprints in the hotel room, phone records placing the Petitioner at Green Hills Mall, and the Petitioner's incriminating statements. Counsel testified that the Petitioner never told him that he invoked his right to an attorney when he met with Nashville detectives in Miami or that the detectives did not honor that request. In reference to that interview, all the Petitioner told Counsel before trial was that he spoke with the detectives but did not make any incriminating statements. Counsel said that, based upon what he knew at the time of trial, he did not think he could have prepared for the Petitioner's trial any differently.

David Raybin, who represented the Petitioner at his motion for new trial hearing but had since withdrawn from representing the Petitioner, testified that he had practiced law for thirty-five years and that his primary area of practice was criminal defense. Raybin estimated that he had taken 100 cases to trial in both state and Federal court. Raybin testified that he had written multiple law review articles, articles for the bar association, and a three-volume treatise on Tennessee criminal law. Raybin said that he had testified at least five times as an expert witness on the issue of standard of care of criminal defense attorneys in post-conviction hearings. In preparation for this hearing, Raybin said that he reviewed his notes, his appellate brief in this case, and his correspondence file. Raybin explained that he was retained by the Petitioner and his family in May 2001 for post-trial matters and a potential appeal. At this point during Raybin's testimony, the Petitioner's attorney requested that Raybin be treated as an expert witness, to which the State objected. The trial court told the Petitioner's attorney to first question Raybin as a "fact witness" and then question Raybin as an "expert witness."

Raybin testified that, after being retained for this case, he met with the Petitioner at the penitentiary several times, he requested Counsel's file, acquired discovery, and requested a trial transcript in preparation to amend the Petitioner's motion for new trial. Raybin said that identification was one of the primary grounds for the Petitioner's motion for new trial based upon a mug shot taken shortly before this incident that depicted the Petitioner with short hair. Raybin testified that he obtained the photograph from the Miami Police Department and found it "significant" because the Petitioner's short hair was inconsistent with eyewitness testimony. Raybin said that he discussed the issue of hair length with the Petitioner but that Raybin was the one who initiated the discovery based upon the identification issue. Because Raybin believed identification to be the central issue in this case, he wanted to know the length of the Petitioner's hair and confirmed it with the police photograph.

Raybin testified that he also met with the attorney representing the Petitioner's co-defendant and discussed that trial at great length. He also reviewed all of the documents from the co-defendant's trial.

In preparing for the motion for new trial, Raybin said that he discussed proceeding on an ineffective assistance of counsel claim with the Petitioner, but that he recommended they first attack procedural errors. Raybin admitted that they could have proceeded on an ineffective assistance of counsel claim, but explained that he determined that to first raise the procedural errors and then later file a post-conviction petition was more advantageous. Raybin testified that the decision was ultimately his as to whether to raise the ineffective assistance issue but that the Petitioner agreed with Raybin's approach.

At this point in the hearing, the Petitioner's attorney again requested that Raybin be submitted as an expert witness. The State objected again based upon Raybin's advocacy in

this case. The trial court overruled the motion and allowed the following to be admitted as expert testimony: Raybin testified that, in his opinion, Counsel "was not involved in the case long enough to have developed a sufficient degree of investigation." Raybin said that the central problem in this case was the "inadequacy of the defense." Raybin said that, because identification in the case was "very weak," the mug shot taken just before this offense was important. Obtaining the mug shot, according to Raybin, was "within the realm of normal behavior, normal things that should have been done." Raybin said that a motion to suppress the Petitioner's statements to detectives should have also been filed. Raybin obtained the jail-time logs indicating that the interview with detectives was two hours, which was inconsistent with the detectives' testimony at trial. Raybin said that Counsel should have requested the Petitioner be allowed to leave the court room during the testimony of witnesses who had not been shown a police line-up. He stated that, at the very least, all witnesses should have been shown a line-up before they testified at trial in order to prevent an in-court identification as happened in the Petitioner's case.

On cross-examination, Raybin agreed that there was not any case law, statute, or rule requiring the State to conduct out-of-court identification procedures. Raybin explained that, even though the State is under no obligation to perform an out-of-court identification, if they refused the request to do so, a defense attorney could "make an issue of it" much like in cases where the State withholds or destroys evidence. Raybin said that a finding that an attorney is ineffective for not doing something of which there is no case law to support him trying to do, is "common sense." Raybin also agreed that no law requires a trial court to prohibit a witness who has not viewed a photographic line-up from taking the stand and identifying a perpetrator. Raybin maintained that an attorney could ask for a pretrial line-up and, if the State refused, make the jury aware of the refusal.

Raybin testified that, if an attorney asks a client if he requested an attorney before a police interview and the client says "no," then the attorney is not ineffective for failing to file a motion to suppress on that bases, but that an attorney must inquire as to whether the client invoked his right to counsel prior to police questioning.

Upon questioning from the court, Raybin testified that he reviewed the Public Defender's office case file and that the Public Defender's office did not file any suppression motions in this case. Raybin said that the Public Defender's office did not attempt to get the Petitioner's Miami mug shots. Raybin agreed that the phone records placing the Petitioner at Green Hills Mall was a significant problem in this case and inconsistent with the Petitioner's trial testimony that he was not at the Green Hills Mall.

Norris Tarkington and Harold Haney, Metropolitan Nashville Police Department detectives, both testified that the Petitioner never requested an attorney when they interviewed

him in Miami and that he never tried to terminate the interview.

Based upon this testimony, the post-conviction court denied post-conviction relief. It is from this judgment that the Petitioner now appeals.

## II. Analysis

The Petitioner argues that he received the ineffective assistance of counsel because Counsel failed to: (1) adequately investigate the case; (2) challenge the pre-trial identifications of the Petitioner; (3) file a motion to suppress the Petitioner's statements to Nashville detectives; and (4) object to the "misleading characterization" of telephone records entered at trial. The Petitioner further contends that the cumulative effect of all of these errors violated his constitutional rights. The State responds that the Petitioner has failed to demonstrate by clear and convincing evidence that Counsel's performance was deficient and that the Petitioner failed to prove he suffered prejudice as a result of Counsel's actions.

In order to obtain post-conviction relief, a petitioner must show that his or her conviction or sentence is void or voidable because of the abridgment of a constitutional right. T.C.A. § 40-30-103 (2009). The petitioner bears the burden of proving factual allegations in the petition for post-conviction relief by clear and convincing evidence. T.C.A. § 40-30-110(f) (2009). Upon our review, the trial judge's findings of fact are given the effect and weight of a jury verdict, and this Court is "bound by the trial judge's findings of fact unless we conclude that the evidence contained in the record preponderates against the judgment entered in the cause." *Black v. State*, 794 S.W.2d 752, 755 (Tenn. Crim. App. 1990). Thus, this Court will not re-weigh or re-evaluate the evidence below; all questions concerning the credibility of witnesses, the weight and value to be given their testimony and the factual issues raised by the evidence are to be resolved by the trial court judge, not the appellate courts. *Momon v. State*, 18 S.W.3d 152, 156 (Tenn. 1999); *Henley v. State*, 960 S.W.2d 572, 578-79 (Tenn. 1997). A post-conviction court's conclusions of law, however, are subject to a purely de novo review by this Court, with no presumption of correctness. *Fields v. State*, 40 S.W.3d 450, 457 (Tenn. 2001).

The right of a criminally accused to representation is guaranteed by both the Sixth Amendment to the United States Constitution and article I, section 9, of the Tennessee Constitution. *State v. White*, 114 S.W.3d 469, 475 (Tenn. 2003); *State v. Burns*, 6 S.W.3d 453, 461 (Tenn. 1999); *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975). The following two-prong test directs a court's evaluation of a claim for ineffectiveness:

> First, the [petitioner] must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not

24

functioning as the "counsel" guaranteed the [petitioner] by the Sixth Amendment. Second, the [petitioner] must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the [petitioner] of a fair trial, a trial whose result is reliable. Unless a [petitioner] makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

*Strickland v. Washington*, 466 U.S. 668, 687 (1984); *State v. Melson*, 772 S.W.2d 417, 419 (Tenn. 1989).

In reviewing a claim of ineffective assistance of counsel, this Court must determine whether the advice given or services rendered by the attorney are within the range of competence demanded of attorneys in criminal cases. *Baxter*, 523 S.W.2d at 936. To prevail on a claim of ineffective assistance of counsel, a petitioner must show that "counsel's representation fell below an objective standard of reasonableness." *House v. State*, 44 S.W.3d 508, 515 (Tenn. 2001) (citing *Strickland*, 466 U.S. at 688).

The reviewing court must evaluate the questionable conduct from the attorney's perspective at the time. *Strickland*, 466 U.S. at 690; *Hellard v. State*, 629 S.W.2d 4, 9 (Tenn. 1982). In doing so, the reviewing court must be highly deferential and "should indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Burns*, 6 S.W.3d at 462. Finally, we note that a defendant in a criminal case is not entitled to perfect representation, only constitutionally adequate representation. *Denton v. State*, 945 S.W.2d 793, 796 (Tenn. Crim. App. 1996). In other words, "in considering claims of ineffective assistance of counsel, 'we address not what is prudent or appropriate, but only what is constitutionally compelled.'" *Burger v. Kemp*, 483 U.S. 776, 794 (1987) (quoting *United States v. Cronic*, 466 U.S. 648, 665 n.38 (1984)). Counsel should not be deemed to have been ineffective merely because a different procedure or strategy might have produced a different result. *Williams v. State*, 599 S.W.2d 276, 279-80 (Tenn. Crim. App. 1980). The fact that a particular strategy or tactic failed or hurt the defense does not, standing alone, establish unreasonable representation. *House*, 44 S.W.3d at 515 (citing *Goad v. State*, 938 S.W.2d 363, 369 (Tenn. 1996)). However, deference to matters of strategy and tactical choices applies only if the choices are informed ones based upon adequate preparation. *House*, 44 S.W.3d at 515.

If the petitioner shows that counsel's representation fell below a reasonable standard, then the petitioner must satisfy the prejudice prong of the *Strickland* test by demonstrating "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland,* 466 U.S. at 694; *Nichols v. State*, 90

S.W.3d 576, 587 (Tenn. 2002). This reasonable probability must be "sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694; *Harris v. State*, 875 S.W.2d 662, 665 (Tenn. 1994).

## A. Failure to Investigate

As part of the Petitioner's claim that Counsel was ineffective for failing to adequately investigate his case, the Petitioner raises ten specific areas in which he alleges Counsel's investigation was inadequate. These allegations are: (1) Counsel failed to secure the Miami mug shot; (2) Counsel failed to secure the newspaper article that included information that Sloan's vehicle windows were tinted; (3) Counsel failed to secure the 911 tape; (4) Counsel failed to locate Nagele's recorded statements; (5) Counsel failed to obtain police reports discussing Detective Tarkington's photographic procedures; (6) Counsel failed to play recordings of witness statements for the Petitioner; (7) Counsel failed to obtain Miami inmate movement records; (8) Counsel failed to obtain Detective Tarkington's and Detective Haney's notes; (9) Counsel failed to obtain the Petitioner's post-arrest statements; and (10) Counsel failed to obtain Detective Haney's police report. We will individually address each of the Petitioner's complaints of Counsel's failure to investigate below.

The Tennessee Supreme Court has held that:

> Counsel must conduct appropriate investigations, both factual and legal, to determine what matters of defense can be developed. The Supreme Court has noted that the adversary system requires that 'all available defenses are raised' so that the government is put to its proof. This means that in most cases a defense attorney, or his agent, should interview not only his own witnesses but also those that the government intends to call, when they are accessible. The investigation should always include efforts to secure information in the possession of the prosecution and law enforcement authorities. And, of course, the duty to investigate also requires adequate legal research.

*State v. Burns,* 6 S.W.3d 453, 462 (Tenn. 1999) (quoting *United States v. DeCoster*, 487 F.2d 1197, 1203-04 (D.C. Cir.1973)). Therefore, Counsel must make all reasonable investigations relevant to the case or must make a reasonable decision that renders particular investigations unnecessary. *Id*. However, "[i]n any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Id*. Whether counsel's decision not to pursue a particular line of investigation is reasonable may be determined with reference to information supplied by the defendant, including his statements and actions. *Strickland*, 466 U.S. at 691. Failure to conduct a reasonable investigation constitutes deficient performance.

26

*Id.*

### 1. Failure to Obtain the Petitioner's Miami Mug Shot

In this case, the post-conviction court found:

> [Counsel] testified that he and Petitioner had discussed the pre-trial identifications and that the identifications were "not clear or positive," so it was his belief that after talking to witnesses that they could not definitively identify Petitioner as the suspect at trial. His understanding was that the witnesses may indicate that Petitioner appeared similar to the people who committed the robbery at the mall: however, there had been various statements about skin color being dark as opposed to very light, so there was area to undermine eyewitness identification on cross-examination. [Counsel] testified that Petitioner never told him about the mug shots taken in Miami.
>
> . . . .
>
> The Court finds the testimony of trial counsel to be credible.

Upon review of the record, we conclude that the evidence does not preponderate against the trial court's findings. The Petitioner testified that he never told Counsel about the Miami mug shot taken shortly before this criminal offense. The Petitioner reviewed the witness identifications and descriptions of the suspects that were provided through discovery. Counsel testified that the Petitioner never told him there was a mug shot taken shortly before this offense and never mentioned that his hair length was different than the witness descriptions. The Petitioner has failed to prove that Counsel was ineffective as to this issue, and therefore is not entitled to relief as to this issue.

### 2. Failure to Obtain Newspaper Articles

As to this issue, the Petitioner asserts that Counsel was ineffective for failing to obtain and use at trial a newspaper article which, in pertinent part, provided:

> A woman was about to unload her two young children from her van when she heard the shot at about 9:15 a.m. and called the police from her cellular phone. She said she crouched down in her seat, told her boys to be quiet and hoped the men would not see her.

This article was given to Raybin by the attorney of one of the co-defendants in this case. This attorney used the article at the trial of the Petitioner's co-defendants to cross-examine Sloan.

27

Additionally, in the co-defendants' trial, it was discovered that Sloan had tinted windows in the car from which she observed the shooting. The State responds that Counsel's failure to obtain this article or discover that a witness had tinted windows prior to trial does not render Counsel's assistance ineffective.

As to this issue, the post-conviction court found:

The Court of Criminal Appeals determined the newspaper article did not constitute newly discovered evidence and found there "was no effective difference between Ms. Sloan's testimony and the statement reported in the paper." *Guartos*, 2006 WL 163633, at *18. Since it has been determined there was no difference between the testimony and the statements printed in the paper, this Court finds that Petitioner has not demonstrated by clear and convincing evidence that he was prejudiced by trial counsel's failure to introduce this article at trial. Further, although [Counsel] was not questioned specifically about the newspaper article, he testified that he did interview the woman at the mall parking lot (Ms. Sloan) and that he felt based on her conversation with him he had [a] fruitful line of questioning on cross examination about her identification in light of the parking lot lighting, her angle of view, and the fact she was in a state of fear when she observed the robbers. The Court credits the testimony of trial counsel that he investigated the eyewitness identification of Ms. Sloan and finds that Petitioner has not demonstrated by clear and convincing evidence that trial counsel was ineffective.

The post-conviction court correctly points out that this Court has previously determined that there was no difference between Sloan's testimony at trial and Sloan's statement printed in the newspaper. At trial, Sloan testified that she "stayed down" during the robbery and had difficulty identifying two of the suspects. This information is substantially similar to her statement to the newspaper that she "crouched down." At the post-conviction hearing, Counsel testified that, through cross-examination, he was able to question Sloan about the circumstances surrounding her identification of the suspects during the robbery, and the post-conviction court credited Counsel's testimony as to this issue. The evidence does not preponderate against the post-conviction courts finding in this respect. The Petitioner is not entitled to relief as to this issue.

### 3. Incomplete 911 Audio Recording

The Petitioner contends that Counsel was ineffective for failing to obtain a complete 911 tape of Sloan reporting the crime to an emergency operator. At the hearing on the

28

Petitioner's motion for a new trial, Sloan testified that she might have provided additional directions to the crime scene. The State responds that Counsel was not ineffective for failing to secure the entire 911 tape. On direct appeal, when the Petitioner claimed that the State's failure to turn over a complete audio recording of the 911 tape was a discovery violation, this Court found: "The State provided the totality of the tape that it had in its possession and the fact that the tape cuts off is not a basis to grant a new trial." *Guartos*, 2006 WL 163633, at *27. The post-conviction court, in denying this claim, noted that the Petitioner did not produce this missing portion of the 911 recording at the post-conviction hearing and that, "since the balance of the recording is unable to be produced, this Court is unable to determine if anything other than what Ms. Sloan testified to at the motion for new trial hearing may exist on the tape. This Court is unable to speculate to its contents."

We can not conclude that Counsel's failure to obtain the remaining portion of a disrupted 911 audio recording constituted ineffective assistance of counsel, especially in light of the fact that the remaining portion, if it existed at all, was not introduced at the post-conviction hearing. The post-conviction court correctly stated that speculation as to the contents of the remaining portion of the 911 audio recording would be improper. Also improper is speculation as to how the absence of this evidence prejudiced the Petitioner. The evidence as to this issue does not preponderate against the post-conviction court's finding that the Petitioner failed to demonstrate by clear and convincing evidence that he suffered prejudice from Counsel's inability to obtain the remainder of the 911 call recording. The Petitioner is not entitled to relief as to this issue.

### 4. Security Guard Nagele's Second Recorded Statement

The Petitioner next claims that Counsel was ineffective for failing to obtain Nagele's second recorded statement to police. Even though Nagele could not identify the Petitioner, the Petitioner maintains that Nagele's testimony is "critical" because it reflects discrepancies between Nagele's testimony and Sloan's testimony about their positions during the shooting. The State in response relies upon this Court's previous ruling that the Petitioner failed to show "any prejudice resulting from the [S]tate's failure to turn over the statement." *Guartos*, 2006 Wl 163633, at *29. The post-conviction court found that the Petitioner failed to establish that he was prejudiced "or even that his trial counsel was ineffective as even the State was unaware that this interview was not contained within the case materials."

After the trial in this matter, the State found an additional recorded statement made by Nagele to police. This second statement was obtained and used by the Petitioner's appellate counsel and raised as an issue at the hearing on the Petitioner's motion for a new trial. The trial court found that it was error for the recording not to be provided to Counsel but, after comparing the two statements, the Court found that "no material inconsistencies [existed]

29

between the two interviews." As the State correctly notes in this appeal that this Court had previously likewise concluded that the State had violated discovery rules[1] but that the Defendant failed to show prejudice resulting from the State's failure to turn over the recording.

Upon our review of the record, we conclude that the evidence does not preponderate against the post-conviction court's findings. The post-conviction court compared Nagele's two statements to the police and found that there were "no material inconsistencies between the two interviews." This Court also noted that Nagele's only statements regarding distances were contained in the initial statement that was disclosed by the State. Thus, any discrepancies between Nagele's statements and Sloan's statements were resolved by the jury. *Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1996). The Petitioner has not shown any prejudice as a result of Counsel's failure to obtain the second recording. The Petitioner is not entitled to relief as to this issue.

### 5. Police Reports Concerning Photographic Lineups

The Petitioner asserts that Counsel was ineffective when he failed to discover police reports discussing the photographic line-up procedures taken with the witnesses in this case. The Petitioner relies on testimony at the hearing on his motion for new trial for this issue. The State responds that the Petitioner has waived this issue because he failed to elicit any testimony as to this issue at the post-conviction hearing. The trial court made the following finding:

> This issue was generally addressed in the Motion for New Trial, but found not to constitute a basis for a new trial. . . . On post-conviction, this issue is framed as an ineffective assistance of counsel issue; however, no testimony was elicited on this specific issue from any witness at the post-conviction evidentiary hearing. Thus, this issue is deemed waived because the Petitioner provided no proof to meet his burden of demonstrating by clear and convincing evidence that trial counsel was ineffective or that he was prejudiced by the alleged deficiency.

The evidence does not preponderate against the post-conviction court's finding as to this issue. At the hearing for the motion on a new trial, the Petitioner attacked the photographic identification procedures used by police as a violation of his right to due process

---

[1] In concluding that the State violated Rule 26.2 of the Tennessee Rules of Criminal Procedure, this Court noted that, "Although the prosecution was unaware the statement existed, it had constructive knowledge of the tape held in the Nashville Police Department's property room.

of law. This is a different legal argument than that of ineffective assistance of counsel. During the post-conviction hearing, the transcript from the motion for new trial was introduced as part of the record, however, not one witness testified specifically as to how Counsel was ineffective for failing to note the detective's error as to dates on his reports or how that omission by Counsel prejudiced the Petitioner. Therefore, the trial court did not err in finding that the Petitioner failed to show by clear and convincing evidence that Counsel was ineffective and any resulting prejudice. The Petitioner is not entitled to relief as to this issue.

### 6. Recorded Statements of Christina Hudson and Barbara Franklin

The Petitioner contends that Counsel was ineffective for failing to play the audio recordings of two witness statements for the Petitioner prior to trial. The State responds that Counsel was not ineffective because, though he was unable to play the recordings at the facility where the Petitioner was incarcerated, he relayed the contents of both recordings to the Petitioner.

As to this issue, the post-conviction court found the following:

At the post-conviction evidentiary hearing, trial counsel testified that he was unable to listen to the recording with Petitioner because there was an issue getting a recording system into the facility where Petitioner was incarcerated. This problem is not unusual and counsel in other cases have noted to this Court their inability to bring in media devices into the county jail and State prison facilities to play certain media such as tapes, CDs, and DVDs. Nonetheless, [Counsel] testified that he discussed the content of the interviews with his client. [Counsel] testified that he was thoroughly aware of the contents of the interview and prepared to question and cross-examine Ms. Hudson and Ms. Franklin about their identification of Petitioner. Accordingly, Petitioner has not demonstrated by clear and convincing evidence that his trial counsel was ineffective for not playing the tapes for Petitioner personally or that Petitioner was prejudiced by any alleged deficiency.

The evidence does not preponderate against the trial court's findings. Counsel listened to Franklin and Hudson's recorded statements but was unable to play them for the Petitioner due to limitations at the facility where the Petitioner was housed. During the post-conviction hearing, Counsel testified, "I know that I discussed the content of the tapes with [the Petitioner] because I wanted to take them to him to play but was unable to do so." The evidence supports the trial court's finding that the Petitioner has failed to show by clear and convincing evidence that Counsel was ineffective in this respect. The Petitioner is not entitled

31

to relief as to this issue.

### 7. Dade County Police Department Inmate Movement Records

The inmate movement log from Dade County indicates that on March 15, 2000, the Petitioner was checked out of confinement for two hours and twenty minutes, during which time Nashville detectives interviewed him. The Petitioner contends that Counsel was ineffective for failing to obtain these records to impeach the detectives when they testified at trial that the interview lasted four or five hours. The State responds that the post-conviction court properly found that the Petitioner did not establish Counsel rendered ineffective assistance as to this issue. The post-conviction court, relying on this Court's conclusion on the Petitioner's direct appeal, that this "impeaching evidence was not so important or convincing to have changed the result of the trial" found that the Petitioner failed to establish he was prejudiced by Counsel's failure to obtain these records. *Guartos*, 2006 WL 163633, at *19.

Counsel testified that he was retained by the Petitioner or the Petitioner's family six weeks before the trial date in this case. At his first appearance on behalf of the Petitioner, Counsel recalled that the trial court made it "very clear" that, even though there was a short period of time for trial preparation, the trial date would not be moved due to a speedy trial issue in a co-defendant's subsequently scheduled trial. Counsel explained at the post-conviction hearing that because of the short period of time in which he had to prepare, in addition to the fact that he acted as his own investigator because the family did not have money to hire an investigator, he was unable in all instances to follow every potential lead or obtain materials, such as the Miami inmate movement records, in time for trial. The Petitioner testified that there was nothing in the discovery records that indicated the duration of the Miami interview and agreed that Counsel, therefore, had no way to know this would become an issue.

We are to consider ineffective assistance of counsel claims within the context of the case as a whole, taking into account all relevant circumstances. *Strickland,* 466 U.S. at 690; *State v. Mitchell*, 753 S.W.2d 148, 149 (Tenn. Crim. App. 1988). Clearly, this case involved many issues, which Counsel had limited time to investigate. Given the specific facts and concerns with this case, Counsel pursued the more obvious issues at hand. That is not to say, however, that defense counsel should not be very careful in accepting new cases that allow for little preparation before a scheduled trial date. The attorney is in the best position to know what must be done to adequately prepare for a trial and should be realistic about his or her ability to adequately investigate given a time constraint. In this case, however, even were we to conclude that Counsel was ineffective for failing to obtain the Miami inmate movement records, the Petitioner has not proven by clear and convincing evidence that the outcome of

32

the trial would have been different had Counsel secured these records. As this Court previously stated, the difference between two hours and twenty minutes and four hours is "not so important or convincing to have changed the result of the trial." *Guartos*, 2006 WL 163633, at \*19. The Petitioner is not entitled to relief as to this issue.

### 8. Handwritten Notes taken by the Detectives

Detective Tarkington and Detective Haney interviewed the Petitioner while he was incarcerated in Miami. No audio or video recordings were taken, but both detectives took handwritten notes of the interview. When the detectives returned to Nashville, they reduced these handwritten notes to a typed report and discarded the handwritten notes. The original handwritten notes were discovered after trial by Raybin and raised as a discovery and due process violation in the Petitioner's motion for new trial. This Court, in denying relief, held that the Petitioner "failed to show that the handwritten notes contained any exculpatory information." *Guartos*, 2006 WL 163633, at \*31.

The Petitioner now contends that Counsel was ineffective for failing to discover the detectives' handwritten notes. The State responds that, because the Petitioner failed to offer evidence that the handwritten notes were any different than the detectives' typed notes, the post-conviction court properly found that the Petitioner failed to meet his burden as to this issue. In making this finding, the post-conviction court noted, "T]he detectives' notes were available in typed form. There is no proof before this Court that the typed notes fail to include any substantive information that was contained within the handwritten notes."

The Petitioner did not put on any additional proof as to this issue at the post-conviction hearing and relied upon the testimony at the motion for new trial. At the motion for new trial hearing, Detective Tarkington testified that, once he reduced his handwritten notes to typewritten form, he discarded the handwritten notes. Detective Haney testified that the typewritten report accurately reflected all of the pertinent information contained within the handwritten notes.

The Petitioner has offered no evidence that the handwritten notes were any different from the typed notes. He had access, therefore, to the information contained in the notes, although in typewritten form, during the trial. Any impeachment value from eliciting testimony from detectives on the fact that they destroyed personal notes after rendering them to typewritten form was nominal. Based upon this evidence, we do not find that the evidence preponderates against the post-conviction court's findings and we agree that the Petitioner failed to show by clear and convincing evidence that Counsel was ineffective or that the Petitioner was prejudiced by the alleged deficiency. The Petitioner is not entitled to relief as to this issue.

### 9. The Petitioner's Post-Arrest Statements

After the trial, appellate counsel learned the Petitioner made an additional statement to Detective Haney after being transported to Nashville. This post-arrest statement is referenced in Detective Tarkington's police report and states the following:

> On 06/26/2001, I checked [the Petitioner] out of jail and he was brought to the CID/Robbery Unit. Once we reached the office Guartos began by asking what he had told Det. Dean Haney and myself when we visited him in the Miami jail several months ago. At the time he stated no one could know he had confessed to being involved in the robbery/homicide for fear of his life but more importantly fear his family would be killed. He stated he hoped we had taped him then because he had nothing else to say. Threats had been made to him because someone in Miami informed old friends he had snitched on the others about the robbery and homicide that occurred in Nashville. He stated he was afraid for his family and had nothing else to say. He did not ask for an attorney and was told if he wanted to talk at a later date he could call me and I would come to the jail and check him out. He was returned to the jail.

This issue was raised as a discovery violation in the Petitioner's direct appeal. This Court found that the State erred in failing to turn over this post-arrest statement, but concluded that the statement was favorable to the State and that the statement would not have changed the outcome of the trial. *Guartos*, 2006 WL 163633, at *20.

The Petitioner asserts that Counsel was ineffective for failing to discover this post-arrest statement. The Petitioner says this statement was important because, "it is consistent with [The Petitioner's] position that he did not make any confession to the authorities in Miami, for the simple reason that, if he had, the police would have had no reason to talk to him once again when he returned to Nashville." In the statement, the Petitioner references his previous statements regarding his involvement in the robbery/homicide and thereby bolsters the State's position that he confessed to detectives in Miami. Further, the fact that detectives wished to speak to the Petitioner after he was arrested on these charges and had returned to Nashville does not prove that he did not previously speak with the detectives. The Petitioner failed to show how he was prejudiced by the failure to have this report, which was favorable to the State. Moreover, this Court has already determined that it was the State that was at fault for the failure to turn over these materials. *Id*. Thus, the evidence does not preponderate against the post-conviction court's findings and we conclude that the Petitioner failed to prove by clear and convincing evidence that Counsel was ineffective for failing to obtain the post-arrest statements or that the Petitioner was prejudiced as a result. The Petitioner is not entitled to relief as to this issue.

### 10. Detective Haney's Police Report

After trial, the Petitioner learned of a police report containing information that someone placed a telephone call from the Howard Johnson motel to an escort service. The Petitioner raised this issue on direct appeal, claiming he was "denied due process by the failure of the state to disclose Detective Haney's police report." The relevant portion of the appellate opinion reads as follows:

> [The Petitioner] claims that his fingerprint on the phonebook placed him in room 204 and that Detective Haney's report would have supported the [Petitioner's] testimony that he had been in the room only to call an escort service for the occupants of the room. The [Petitioner] claims that if he had this report at the trial, it would have supported his credibility by corroborating his testimony and allowed him to cross-examine Detective Haney about the escort service.
>
>       . . . .
>
> We conclude that the report was not material and that the state's failure to disclose it to the defense did not constitute a *Brady* violation. In this regard, we note that the report corroborated the defendant's statement that he called an escort service from room 204. That fact, however, is not incongruous with the defendant's culpability in the robbery. Although someone from room 204 called an escort service, we conclude that the jury could well have accepted the defendant's statement that he called an escort service from room 204 and still determined that he along with his room 204 confederates committed the robbery. The [Petitioner] has failed to demonstrate that a reasonable probability exists that the result of his trial would have changed had he been provided Detective Haney's report.

*Guartos*, 2006 WL 163633, at * 30. The Petitioner now raises this issue in his petition for post-conviction relief, claiming that Counsel was ineffective for failing to obtain Detective Haney's report.

On direct appeal, this Court determined that the State erred by failing to provide Detective Haney's report to the Petitioner. Based upon the foregoing reasoning, however, this Court concluded that the Petitioner failed to prove prejudice. *Id.* As we have previously stated, we can not impute the State's failure to turn over evidence to Counsel. Further, even assuming the Petitioner has proven Counsel was ineffective in this respect, he has failed to show prejudice. The Petitioner's having called an escort service from Room 204 does not preclude him as a suspect in these crimes. It is merely evidence that places him in Nashville

35

and with co-defendants accused of the crimes at the time of this criminal incident. The Petitioner has failed to prove that the outcome of his trial would have been different had this evidence been available to him. Thus, the evidence does not preponderate against the post-conviction's finding that the Petitioner has failed to demonstrate prejudice. The Petitioner is not entitled to relief as to this issue.

## B. Failure to Challenge Pre-Trial Identifications

The Petitioner asserts that Counsel was ineffective for failing to file any motions to suppress the identifications. Specifically, he challenges Counsel's failure to: (1) make a challenge based upon the State "pointing out" the Petitioner "was in the courtroom prior to trial"; (2) impeach Sloan on her identification of the Petitioner; (3) challenge Barbara Franklin's identification of the Petitioner; (4) challenge Stacey Butts's identification of the Petitioner. He further contends that "the post-conviction court erred in concluding that these claims had been previously determined." The State responds that, because Counsel did not believe a legal basis existed upon which to file a motion to suppress the identification and because he decided to pursue impeachment of the eyewitnesses, the evidence does not preponderate against the post-conviction court's findings as to these issues.

### 1. Sloan's Identification

The Petitioner claims that Counsel was ineffective for failing to file a motion to suppress Sloan's identification. In support of the post-conviction court's denial of this claim, it made the following findings:

> [Counsel] testified that he reviewed the identification evidence and did not see a legal basis for filing any motions to suppress identification, nor did Petitioner's prior trial counsel. As such, his trial strategy was to impeach the eyewitnesses as to their ability to identify Petitioner as the robber. [Counsel] testified that he interviewed "one of women in at the mall parking garage" prior to trial and it was his belief based on that conversation that she would be unable to definitively identify Petitioner as the robber. The Court finds [Counsel's] testimony to be credible.

We do not find that the evidence preponderates against the trial court's findings in this respect. Counsel made a strategic decision regarding the witnesses who could potentially identify the Petitioner at trial based upon his investigation and research. The Petitioner is not entitled to relief as to this issue.

Even though the Petitioner's claim is that Counsel was ineffective for failing to

challenge Sloan's identification of him, his argument in his brief focuses on two issues: (1) that Sloan's testimony was inconsistent with Nagele's testimony and thus her identification questionable; and (2) that the State unfairly asked Sloan if she saw the Petitioner in the courtroom.

As to the first issue, it would appear the Petitioner is requesting this Court to address a question involving the credibility of the witnesses, which is an issue that has previously been resolved at trial by the trier of fact. *See State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997).

The Petitioner's second claim, that the State engaged in misconduct, has previously been resolved by this Court in the Petitioner's direct appeal.

> We conclude that the state's actions do not offend due process. We note that unlike the myriad [of] cases cited by the [Petitioner], Ms. Sloan had *already identified the [Petitioner]* when she picked his picture out of a photograph array shown to her by Officer Tarkington in July 1999, confirming the [Petitioner's] identity as one of the robbers. Further, although the state's actions may have been suggestive, we believe they were not impermissibly so.

*Guartos*, 2006 WL 163633, at *21. Since there was no misconduct by the State, Counsel was not ineffective for not challenging the State's conduct. Moreover, the Petitioner acknowledges in his brief that neither Counsel nor the Petitioner were aware at the time of trial that anyone had asked Sloan if anyone in the courtroom looked familiar to her. The Petitioner is not entitled to relief as to this issue.

### 2. Impeachment of Sloan

The Petitioner next compares Sloan's testimony from the co-defendants' subsequent trial to her testimony at the Petitioner's trial. The Petitioner states there is a "gross inconsistency in the evidence" and attributes this inconsistency to the fact that Sloan's "identification was contaminated by the fact that she saw [the Petitioner] in the courtroom prior to his identification by her in court." Based upon this, the Petitioner says that Sloan's identification should have been challenged by Counsel. The Petitioner, however, does not explain to this Court how Counsel could have challenged Sloan based upon her subsequent testimony at the trial of the co-defendants in this case. We agree with the post-conviction court that the Petitioner has failed to show by clear and convincing evidence that Counsel was deficient in this regard. The Petitioner is not entitled to relief as to this issue.

### 3. Barbara Franklin and Stacy Butts

Barbara Franklin and Stacy Butts both worked in the jewelry store and both described the Petitioner during police interviews. The Petitioner points to inconsistencies between their statements and makes the following claim:

> It is clear that [Stacy Butts's] descriptions and identifications do not match those of Barbara Franklin, who was standing right next to her in the store. Thus, the in-court identification of Ms. Butts must be considered inconsistent and unreliable for use at trial. Ms. Butts never asked to participate in any photo lineup of the [Petitioner] or anyone else. She simply came into the courtroom and identified [the Petitioner] with no procedural protections whatsoever.

The Petitioner's argument attacks inconsistency in witness testimony and procedural safeguards as to identifications. As we have stated previously, resolution of inconsistencies in witness testimony are resolved by the trier of fact. *Bland*, 958 S.W.2d at 659. The Petitioner does not put forward any explanation as to what "procedural protections" he thinks were required of the State or Counsel when a witness identifies a defendant from the witness stand. Upon our review of the post-conviction hearing, there was no evidence presented as to this issue. Thus, we conclude that the Petitioner has failed to prove by clear and convincing evidence that Counsel was ineffective in this regard. The Petitioner is not entitled to relief as to this issue.

## 4. Previously Determined Claims

Finally, the Petitioner claims that the post-conviction court "broadly denied the claim" based upon its finding that the grounds had been previously litigated. The State responds that the post-conviction court properly found that some of the issues had been previously litigated. In its order, the post-conviction court first addressed all of the Petitioner's identification claims in light of the evidence in concluding that the Petitioner was not entitled to post-conviction relief on this claim. It then went on to state:

> Further, the Court notes that several of the grounds raised within Petitioner's broader pre-trial identification claim have been previously litigated and, therefore, [are] not a cognizable basis for post-conviction relief. *McBee*, 655 S.W.2d at 196; *Searles*, 582 S.W.2d at 392-93.

Upon our review of the record, we too found that several of the Petitioner's arguments were very similar to his arguments made on direct appeal. Additional testimony on how the claim previously asserted as prosecutorial misconduct or a due process violation is now being presented as a claim of ineffective assistance of counsel was not elicited at the post-conviction

38

hearing. Even so, the post-conviction court found that the evidence did not support the Petitioner's claim before noting that the Petitioner was arguing issues similar to those that had been resolved on appeal. The Petitioner is not entitled to relief as to this issue.

### C. Failure to Move to Suppress the Petitioner's Statements

Nashville detectives interviewed the Petitioner about this criminal incident while he was incarcerated on other charges in Miami. The Petitioner contends that he asserted his right to counsel and the detectives did not honor this request. Based upon this, the Petitioner asserts that Counsel was ineffective for failing to file a motion to suppress his statements to detectives during this Miami interview.

The post-conviction court made the following findings as to this issue:

[Counsel] testified that he did not file any pre-trial motion in this case, such as a motion to suppress statements, and noted that Petitioner's prior counsel had not done so either. He testified that when he and [the] Petitioner discussed the Florida interview, [the] Petitioner maintained he did not make any incriminating statements. [The] Petitioner also never indicated that he asserted his right to counsel during the interview and was denied that right. Thus, [Counsel] did not believe there was any legal basis to file a suppression motion. Instead he testified he attempted to impeach the officers through cross-examination as to the veracity of the interview and emphasized especially the fact that the police went to Miami with the intent to perform an interview but opted not to bring a recording device.

This Court finds [Counsel's] testimony to be credible. [The] Petitioner has not met his burden of demonstrating by clear and convincing evidence that [Counsel] was ineffective for failing to file a motion to suppress statements or that he has been prejudiced by the alleged deficiency.

Upon our review of the record, we agree with the post-conviction court's findings. The Petitioner never told Counsel he had asserted his right to counsel and the detectives did not honor his request. He told Counsel that he did not make incriminating statements, but, when Counsel spoke with the detectives, they stated otherwise. Both Detective Tarkington and Detective Haney testified that the Petitioner never requested his attorney during the course of the interview. Based upon this information, Counsel testified that he did not believe that he had a basis on which to assert a motion to suppress and that, therefore, his strategy was to attempt to impeach the detectives' testimony at trial. The Petitioner is not entitled to relief as to this issue.

## D. Telephone Records at Trial

The Petitioner asserts that Counsel was ineffective for failing to object to the introduction of phone records at trial based upon the misleading characterization of the phone records. During the trial, the State introduced two sets of phone records. The first set was dated March 17, 1999, and was entered to show the subscriber of the telephone number. The second set of phone records were the calling records, which indicate what calls were placed from a phone number. The Petitioner contends that the two records were confusing to the jury and, in support of this contention, points to the trial court's request for clarification about the records in the subsequent sentencing hearing on this matter.

The post-conviction court first noted that no testimony on this issue, as it related to an ineffective assistance of counsel claim, was introduced at the post-conviction hearing. The trial court then relied upon the following findings made in a previous order addressing this issue after the motion for new trial:

> The State called the BellSouth custodian of the records, James Spearman, to testify at trial. First, the State asked Mr. Spearman about subscriber information for certain phones on March 17, 1999 (the day of the robbery), and Mr. Spearman explained that subscriber information concerns who actually owns the phone and where the phone is physically located. The information was summarized on a document entered as trial exhibit 37. The top of the exhibit is clearly marked "BellSouth Subscriber Information on March 17, 1999." This document was used to lay a foundation for an "Unbilled Call Report," which contained detailed calling records from the Howard Johnson Motel from March 14-17, 1999. The "Unbilled Call Report" document shows a call was made from the hotel room on March 16, 1999, the day of the robbery to the phone number (615-383-9824). The phone number is identified on the BellSouth Subscriber Information exhibit as belonging to the Mall at Green Hills.

> Although [the Petitioner] points out that following the trial, at the sentencing hearing on May 16, 2001, the Court sought clarification regarding the date the call was made at, the Court has reviewed the transcript and finds that the clarification was just that; since over a month had passed since the [Petitioner]'s trial and since the Court had heard numerous cases since [the Petitioner]'s trial, the Court simply had forgotten that the telephone records consisted of several exhibits that needed to be examined together, namely the subscriber list from March 17, 1999, which explained what phone numbers

belonged to what entities and the Howard Johnson detailed phone call list from March 14, 17, 1999, which set forth the phone numbers called on specific dates. The Court has reviewed the trial testimony and finds that the evidence regarding the phone calls was not mischaracterized to the jury.

(citations omitted).

Based upon our review of the record, we conclude that the Petitioner has not proven by clear and convincing evidence that Counsel was ineffective for failing to object to these phone records. Thus, the Petitioner is not entitled to relief as this issue.

### E. Cumulative Effect of Error

Finally, the Petitioner contends that the cumulative effect of the errors alleged above entitles him to a new trial. Having found no error, we conclude that the Petitioner is not entitled to relief on this issue.

### III. Conclusion

After a thorough review of the record and relevant authorities, we conclude that the post-conviction court properly denied the Petitioner's petition for post-conviction relief. Accordingly, we affirm the judgment of the post-conviction court.

_____
ROBERT W. WEDEMEYER, JUDGE